HOWARD L. ROSS,
14 Harrington Ct.
Madison, WI 53718

       Plaintiff,

v.                               Case No. _____

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM
Van Hise Hall, 1220 Linden Drive
Madison, WI 53706

and

RICHARD J. TELFER
304 South Woodland Drive
Whitewater, WI 53190

JAMES W. FREER
7446 Cedar Lane
Fremont, WI 54940

INDRA MOHABIR
Owatonna College & University Center
965 Alexander Drive Southwest
Owatonna, MN 55060

MARTHA D. SAUNDERS
The University of Southern Mississippi
Aubrey Keith Lucas Administration Building
Office of the President
2701 Hardy Street, 1st Floor
Hattiesburg, MS 39406-0001

       Defendants.

## COMPLAINT

COMES NOW, Dr. Howard L. Ross, by his attorneys, Kasieta Legal Group, LLC, by Robert J. Kasieta and Andrew J. Parrish, and as and for his Complaint in the above-captioned matter respectfully alleges and states to the Court as follows:

## I.  Nature of the Action

1.     This civil action is brought against the Defendant Board of Regents of the University of Wisconsin for violation of Plaintiffs' rights under Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. Section 2000e, *et seq.* and all related statutory and regulatory framework relating to and amending the aforementioned statutes.

2.     This civil action is also brought against Defendants Richard J. Telfer, James W. Freer, Indra Mohabir, and Martha D. Saunders pursuant to Sections 1983 and 1988 of Title 42 of the United States Code for violations of the First and Fourteenth Amendments to the U.S. Constitution as well as all related statutory and regulatory framework relating to and amending the aforementioned statutes.

3.     This civil action is also brought against Defendants Richard J. Telfer, James W. Freer, and Indra Mohabir pursuant to Section 1985(3) of Title 42 of the United States Code for conspiring to deprive Plaintiff of the rights guaranteed to him under the First Amendment to the United States Constitution and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution as well as all related statutory and regulatory framework relating to and amending the aforementioned statute.

4.     Plaintiff Howard L. Ross alleges that he was subjected to adverse employment actions and public defamation on the basis of race and color and also was subjected to unlawful retaliation for his public speech opposing discriminatory acts.

## II.  Jurisdiction

5.     In this action, arising under the Constitution and laws of the United States, jurisdiction is conferred upon the court by 28 U.S.C. §§ 1331 and 1343(a)(1), (3) and (4).

6.     Venue is proper in the Eastern District of Wisconsin pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), because this district is the district in which many of the events giving rise to the claims occurred and is where one or more of the defendants may be found.

## III.  Parties

7.     Plaintiff Dr. Howard L. Ross (hereinafter "Dr. Ross") is an adult male resident of the State of Wisconsin residing at 14 Harrington Court, Madison, WI 53718.

8.     Defendant, Board of Regents of the University of Wisconsin System (hereinafter "Board of Regents"), is the governing body of the University of Wisconsin System, including the University of Wisconsin-Whitewater (hereinafter "UW-Whitewater" or "university"), with offices located in the County of Dane at Van Hise Hall, 1220 Linden Drive, Madison, Wisconsin 53706.  In that capacity, it is the ultimate authority with respect to the subject of this action.

9.     Defendant Richard J. Telfer (hereinafter "Telfer") is now the Interim Chancellor of UW-Whitewater but at all material times to this action was the Provost and Vice-Chancellor of Academic Affairs at UW-Whitewater.   In that capacity, he had

control and authority over Dr. Ross with respect to the subject matter of this action. Defendant Telfer is believed to be residing at 304 South Woodland Drive, Whitewater, Wisconsin 53190.

10.    Defendant James W. Freer (hereinafter "Freer") is an adult resident of the State of Wisconsin believed to be residing at 7446 Cedar Lane, Fremont, Wisconsin 54940. At times material to this action, he was the Vice-Chancellor for Administrative Affairs at the Whitewater campus of the University of Wisconsin. As Vice-Chancellor, Defendant Freer had control and authority over Dr. Ross in matters regarding Plaintiff's employment at UW-Whitewater.

11.    Defendant Indra Mohabir (hereinafter "Mohabir") is believed to be an adult resident of the State of Minnesota whose residential address is unknown, but is believed to have a place of business at Owatonna College & University Center, 965 Alexander Drive Southwest, Owatonna, Minnesota 55606. At times material to this action, Mohabir was an adult resident of the State of Wisconsin and employed by the Board of Regents as the Internal Audit Director for the Whitewater campus of the University of Wisconsin. In that capacity, Ms. Mohabir had control and authority over internal audits conducted at UW-Whitewater, including audits of Dr. Ross.

12.    Defendant Martha D. Saunders (hereinafter "Saunders") is believed to be an adult resident of the State of Mississippi whose residential address is unknown but whose place of business is believed to be located at The University of Southern Mississippi, Aubrey Keith Lucas Administration Building, Office of the President, 2701 Hardy Street, 1st Floor, Hattiesburg, MS 39406-0001. At material times, Saunders was the Chancellor of the University of Wisconsin-Whitewater. In that capacity, Saunders

was the chief executive officer of the Whitewater campus of the University of Wisconsin with respect to the subject matter of this action, and had control and authority over Dr. Ross and over Defendants Telfer, Freer, and Mohabir.

13.     At material times, individual Defendants acted within the scope of their employment and under color of state law, statutes, ordinances, regulations, policies, customs, and usages of the State of Wisconsin.

14.     Dr. Ross has satisfied any prerequisites for filing this action, including filing a complaint with the Equal Rights Division of the State of Wisconsin Department of Workforce Development on February 8, 2007.  Dr. Ross then received a right to sue letter on December 28, 2007.


### IV.  Allegations of Fact as to All Causes of Action

15.     Dr. Ross is African-American and his skin color is black.

16.     In or about August 1993, Dr. Ross commenced his employment as Dean of the College of Letters and Science at UW-Whitewater and was employed in that position satisfactorily until April 2006.  At all material times, Dr. Ross has also been employed as a tenured professor in the Philosophy and Religious Studies department.

17.     At material times, Dr. Ross was one of only two African-American deans at UW-Whitewater.

18.     Pursuant to his position as dean, Dr. Ross was issued a state employee purchasing credit card ("purchase card") to make purchases for university needs.  Dr. Ross was first issued a purchase card in 1996.  Purchase cards at UW-Whitewater are also commonly known as "P-Cards" and "Procards."

19.     University purchases were typically made through two different means. Administrators were issued purchase cards to purchase items costing less than $5,000 in order to decrease the time and money spent by the university in processing transactions. Items purchased through the university's accounts payable system were processed and approved by the Purchasing Department, which also maintained the records of those purchases.

20.     UW-Whitewater has a charter and related policies governing the conduct of internal audits at the university.  The audit charter is designed, in part, to ensure objectivity, integrity, and accuracy of internal audits.

21.     The audit charter directs that the internal auditor will report administratively to the Vice Chancellor for Administrative Affairs, or otherwise report directly to the Chancellor or the UW System Administration.

22.     At all material times until Dr. Ross's demotion in April 2006, Mary Pinkerton was the Associate Dean of the College of Letters and Sciences at UW-Whitewater.   In that position, Pinkerton was responsible for managing the college budgets, including all purchase card transactions in the college and including transactions made on Dr. Ross's card.

23.     Dr. Ross provided receipts from his purchase card transactions to Pinkerton, who maintained all accounts, budgets and receipts on behalf of Dr. Ross.  This practice was specifically noted in a 1999 Procard Audit Summary issued on October 19, 1999 by UW-Whitewater, and the practice did not materially change in any subsequent years.

24.     At all material times, other personnel in the College of Letters and Sciences were also designated as authorized users of Dr. Ross's assigned purchase card.

25.     In or about 1999, UW-Whitewater notified its employees that discounted cellular phone plans were available to UW employees for university business through Ameritech. Dr. Ross subsequently obtained his cellular phone and service plan through that Ameritech program. Ameritech subsequently did business as Cingular Wireless. Dr. Ross maintained the Cingular plan through UW-Whitewater until April 2006, and was never directed by UW administration to change his service plan.

26.     Dr. Ross's cell phone service plan was a flat rate plan that did not charge for separate phone calls.

27.     In or about January 2005, the State of Wisconsin Department of Administration ("DOA") issued the first state-wide policy governing the use of state-issued cellular phones. DOA specifically directed that the Statewide Enterprise Policy for Cellular Telephone Services ("Enterprise Policy") was to be used in place of campus-specific policies within the University of Wisconsin System.

28.     The Enterprise Policy contains a provision allowing reimbursement to state employees for business use of personal cellular phones and allows essential personal calls to be made from a state-issued cell phone.

29.     Upon information and belief, UW-Whitewater personnel altered the Enterprise Policy of allowing reimbursement for verifiable business calls made on personal cellular phones. The version of the policy maintained by UW-Whitewater falsely purports to be issued by DOA but prohibits reimbursement of business calls made on personal cellular phones.

30.     In or about February 2005, UW-Whitewater initiated an audit of cellular phone usage for state-issued phones.  The audit was conducted by Defendant Mohabir.

31.     Dr. Ross fully complied with the cell phone audit in the same manner as others whose cell phone usage was audited.  Dr. Ross promptly complied with all requests from the auditor, including completing a survey of the cellular phone policies and usage in the College of Letters and Sciences, providing three months of his cell phone bills, and noting any personal calls made on the cell phone.

32.     On or about June 8, 2005, a final cell phone audit report was issued by Mohabir.  The cell phone audit report concluded that UW-Whitewater did not have any policy in effect that placed limits on cell phone charges or that provided any oversight to monitor cell phone usage to determine whether more cost-effective phone plans could be implemented.  Most UW-Whitewater departments did not have any implemented policy governing cell phone usage.

33.     The cell phone audit report noted that the cell phone usage of many UW-Whitewater personnel violated the Enterprise Policy.

34.     Dr. Ross was singled out in the cell phone audit for allegedly violating the Enterprise Policy by having a "personal" cell phone through Cingular rather than U.S. Cellular.  Mohabir specifically cited the falsified version of the Enterprise Policy to support the allegation against Dr. Ross.

35.     Due to Defendants' complaints about his cell phone plan, Dr. Ross ceased using a purchase card to pay for his university cell phone.  The selective audit scrutiny that was being applied to the African-American deans also prompted Dr. Ross to voluntarily relinquish his purchase card in or about July 2005.

36.     In or about August 2005, an allegedly routine audit of Dr. Ross's purchase card activity for the time period of January 2005 to June 2005 was conducted by Mohabir.  At that time, Dr. Ross did not have a university purchase card.  The only other UW-Whitewater employee being audited at that time was the other African-American dean, Dr. Lee Jones.

37.     While auditing the other African-American dean, Mohabir openly stated that she wished that all black people could be as honest as Michael Jordan.  Subsequently, Mohabir publicly justified her statement as praising Jordan rather than insulting the African-American dean.

38.     Defendant Mohabir was responsible for carrying out the audit of Dr. Ross under the supervision and direction of Defendants Telfer and Freer.

39.     During the audit in August 2005, Mohabir was openly hostile and disrespectful towards Dr. Ross and made offensive remarks to him.  On one occasion when Dr. Ross questioned Mohabir about her disparate treatment of the African-American deans, Mohabir replied that she was only auditing the black deans because the white administrators on campus were more honest.

40.     During the audit, Mohabir repeatedly harassed Dr. Ross and his staff by appearing unannounced at his office, demanding to inspect office equipment and other items, and rifling through Dr. Ross's bags, offices, and personal belongings.

41.     Dr. Ross spoke out both publicly and privately about the discriminatory practices occurring at UW-Whitewater with respect to the unequal treatment of African-American deans.

42.     Dr. Ross sent correspondence to Telfer and Freer reporting the harassing conduct of Mohabir and questioning whether that conduct was compliant with university policy.

43.     In or about late November or early December 2005, Dr. Ross was contacted by a newspaper reporter regarding the pending audits.  Dr. Ross expressed concern to the reporter that the African-American deans were being singled out in selective and harassing audits.  Dr. Ross' critical statements were subsequently published in national newspaper articles.

44.     Following the publication of Dr. Ross' critical statements, he was admonished by Telfer for his public criticisms of race discrimination at UW-Whitewater and was warned by Telfer to not speak out again.

45.     On or about December 20, 2005, Freer sent a memorandum to Dr. Ross claiming that UW-Whitewater had received an open records request for all audit reports completed of Howard Ross and his management of the College of Letters and Sciences going back to 2000.  UW-Whitewater subsequently released reports of audits and/or reviews that were conducted for the years 2000, 2003, and 2004.

46.     Upon information and belief, in or around December 2005 or January 2006, Defendants enlarged the six month audit of transactions on Dr. Ross's purchase card to cover all transactions for the prior six to seven years.  Dr. Ross was not informed of this new audit nor was any information requested of him in connection with the multi-year audit until after it was completed.

47.     Upon information and belief, Mohabir continuously received instructions and directives from Telfer and Freer regarding the scope, nature, and substance of the audit of Dr. Ross.

48.     Upon information and belief, multiple draft reports of the six-year audit were created and sent to Telfer and Freer during the course of the audit, whereby Telfer and/or Freer responded with directives regarding the substance and scope of the audit.

49.     The only analytical support for the six-year audit were "schedules" created by the internal auditor that simply consisted of spreadsheets itemizing purchases alleged to have been conducted by Dr. Ross on his purchasing card.  The schedules purported to show the dates of purchases, amounts purchased, brief descriptions of the vendor, and the auditor's selective comments.  There was a total of over twenty "schedules" created at various times, both before and after the public release of the six-year audit report in April 2006.  Each schedule was categorized according to pre-determined conclusions by Telfer, Freer, and Mohabir that the itemized transactions violated a specific university policy.

50.     On February 24, 2006, Mohabir issued a memorandum to Telfer and Freer which described various purchases alleged by Mohabir to have been made on Dr. Ross's purchase cards.  The memorandum asked Telfer to work with Dr. Ross to provide further information about the purchases.  The memorandum also requested that Telfer provide his own determination as to whether purchases were appropriate.

51.     On or about February 27, 2006, Telfer met with Dr. Ross and provided him with the February 24, 2006 memorandum.  This was the first time that Dr. Ross was informed that an expanded audit covering six to seven years of purchases was being conducted without his knowledge.

52.     At the meeting on or about February 27, 2006, Telfer downplayed the significance of the six-year audit to Dr. Ross. He instructed Dr. Ross to try to respond to the memorandum to the best of his ability and that no responses were needed for purchases occurring more than two years prior. Telfer did not instruct Dr. Ross to locate or provide receipts or invoices for any purchases. The memorandum also did not request that Dr. Ross provide any receipts or invoices.

53.     On or about March 1, 2006, Dr. Ross provided a response to the February 24 memorandum pursuant to Telfer's instructions.

54.     Dr. Ross was subsequently informed by Freer and Telfer that the alleged audit had to be completed promptly because there was a "pending" open records request for the report.

55.     Later in March 2006, Dr. Ross again spoke out both publicly and privately about the racial discrimination taking place at UW-Whitewater.

56.     Also in or about March 2006, Dr. Ross was informed by then UW-Whitewater Chancellor Martha Saunders that the audit would not be publicly released if he agreed to resign from his position as dean. Dr. Ross refused to resign.

57.     UW-Whitewater internal audit charter and policies require that an auditee be permitted thirty days to respond to a draft audit report, regardless of the length and nature of the audit, in order to ensure the accuracy of the audit findings.

58.     On March 27, 2006, Dr. Ross was provided with a memorandum and an attached draft audit report encompassing six to seven years of transactions and containing Mohabir's purported conclusions about the propriety of the transactions. Defendants demanded Dr. Ross's response by April 3, 2006.

59.     Dr. Ross made a concerted effort to respond to the draft audit reports in the limited time he was allotted, and sent correspondence to the Defendants and other UW-Whitewater personnel that pointed out material errors in the reports that he was able to identify based on the limited information he was provided.  Defendants did not revise the audit report prior to its release to correct the obvious and material errors that were noted by Dr. Ross.

60.     The amounts reported in the draft audit report and the subsequent final report were derived from the schedules prepared by Mohabir, which allegedly supported Mohabir's conclusions in the audit reports.  Dr. Ross was provided with only some of the audit schedules on March 27, 2006, while other schedules were withheld from him.

61.     The alleged audit report was completed and characterized as a final report on April 19, 2006 (hereinafter referred to as "April Report").

62.     Also on April 19, 2006, Freer sent a memorandum to Dr. Ross claiming that UW-Whitewater had received an open records request for the April Report and that Dr. Ross would have to notify the university by April 26, 2006 of whether he intended to seek a court order to restrain the release of the April Report.

63.     The April Report was released to the media on April 26, 2006.  On the same day, Saunders terminated Dr. Ross via memorandum, citing the false and pre-textual accusations of financial impropriety contained in the April Report as the grounds for dismissal.

64.     Dr. Ross was informed of his termination by Telfer, who provided Dr. Ross with Saunders's termination memorandum on the morning of April 26, 2006. Telfer demanded that Dr. Ross vacate his office by the end of the day on April 26.

65.     On its face, the April Report contained a litany of false, misleading and defamatory allegations against Dr. Ross, including but not limited to the following:

a)      The April Report falsely claimed to pertain only to purchase card usage.  In fact, the April Report included numerous expenditures that were paid through accounts payable invoicing and authorized by other University personnel, thus falsely inflating the total transaction amounts attributable to Dr. Ross's purchase card usage.

b)      The April Report falsely claimed to pertain only to Dr. Ross's purchase card usage.  In fact, the April Report also included expenditures not made by Dr. Ross, but by other users of the same purchasing card, thus falsely inflating the total transaction amounts attributable to Dr. Ross's purchase card usage.

c)      The April Report falsely claimed that Dr. Ross charged more than $15,000 to his purchasing card to pay for his "personal" cellular phone and that Dr. Ross had been previously directed to discontinue use of the provider.  In fact, Dr. Ross's cellular phone plan was with a state-contracted provider, was used for university business, and had been maintained by Dr. Ross prior to the time that UW-Whitewater changed its primary cellular phone contract.  Dr. Ross's cell phone provider was at all times known to Defendants, who had never directed Dr. Ross to discontinue that service.

d)      The April Report falsely claimed that Dr. Ross failed to identify any personal calls made on his University cellular phone, and therefore was required to reimburse the University for all calls made on the University cellular phone.  In fact, Dr. Ross fully complied with all requests for information regarding his cell phone, provided the auditors with the cell phone billing statements they requested, and identified each

limited instance where the cellular phone was used to make essential personal calls as authorized under the Enterprise Policy.

e) The April Report falsely claimed that Dr. Ross did not receive approval for foreign language lessons. In fact, Dr. Ross received approval to take foreign language lessons from a former Provost in order to facilitate Dr. Ross' professional development, his promotion of foreign language instruction at UW-Whitewater, his implementation of student foreign exchanges at the University, instruction of foreign travel classes, and the creation of an institutional exchange agreement between UW-Whitewater and the International University of Technology in Marseille, France.

f) The April Report falsely claimed that Dr. Ross purchased alcohol and flowers with the purchasing card. In fact, the purchase of alcohol was made by a different University administrator, which was clearly noted on the invoices for the purchases in question. Flowers for the funeral of a deceased faculty member were also purchased by a different University employee, and appropriate funds had already been transferred prior to the audit to cover the mistaken expenditure. Defendants were aware of these facts before the audit was released to the media, and the corresponding allegations against Dr. Ross were rescinded after the release of the audit.

g) The April Report falsely alleged that Dr. Ross only held purchase cards between March 12, 1999 and July 15, 2005. In fact, Dr. Ross was initially issued a purchase card in 1996, and completely new cards were issued to Dr. Ross in 1997, 2000, and November 2005.

h)        The April Report also relied upon the falsified Enterprise Policy when claiming that Dr. Ross violated state policy by allegedly paying for his "personal" cell phone with a university purchasing card.

i)        The April Report falsely insinuated that Dr. Ross refused to allow UW-Whitewater to obtain his cellular phone records from Cingular.  In fact, Dr. Ross was never asked to provide the records nor was he asked to assist the auditor in obtaining any records.

j)        The April Report falsely claimed that Dr. Ross did not maintain the required purchasing card log.  In fact, a purchasing card log was at all times maintained on Dr. Ross's behalf by Associate Dean Mary Pinkerton.

k)        The April Report falsely claimed that Dr. Ross did not retain receipts for purchases.  In fact, receipts for purchases were retained and maintained on Dr. Ross's behalf by Associate Dean Mary Pinkerton, and, upon information and belief, receipts dating back to 1999 were provided to the internal auditor.

l)        The April Report falsely claimed that Dr. Ross did not reconcile purchase card statements.  In fact, purchase card statements were reconciled on Dr. Ross's behalf by Associate Dean Mary Pinkerton.

m)        The April Report falsely claimed that Dr. Ross used the purchase card for "personal travel expenses."  In fact, the travel expenses were all incurred for official university travel.

n)        The April Report falsely alleged that Dr. Ross used the purchase card to download music from a certain vendor.  In fact, the identified purchases were to obtain teaching materials for the Astronomy department.

o)   The April Report falsely claimed that a 1999 review of purchase card usage identified "compliance issues" with Dr. Ross's purchase card.  In fact, the 1999 audit was completely uncritical of Dr. Ross, determined that Pinkerton maintained very organized records and receipts on Dr. Ross's behalf, and noted the only minor problem was that the University Bookstore had charged $1.64 in tax on a single transaction not attributed to Dr. Ross.

p)   The April Report falsely claimed that Dr. Ross had been apprised of compliance issues after purchase card reviews or audits in 2003 and 2004, and each time acknowledged he had failed to comply with university policy.  In fact, Pinkerton, not Dr. Ross, was interviewed in conjunction with the 2003 and 2004 audits, and Dr. Ross did not make the comments attributed to him in the April Report.

q)   The April Report falsely claimed that Dr. Ross had not provided any explanation for what the Defendants claimed were "department store" purchases.  In fact, Dr. Ross provided a detailed response regarding the alleged "department store" purchases, and specifically noted that items such as flooring to repair flood damage in a college office were not purchased at a department store with a purchase card, but were purchased through accounts payable from university-approved vendors.  Defendants ignored Dr. Ross's responses and issued the April Report without correction.  However, the alleged "department store" purchase violations were promptly rescinded after the public release of the April Report.

66.   The audit intentionally or recklessly accused Dr. Ross of violating University policies that did not exist, did not apply to university deans, and/or had never been applied to deans who were not African-Americans.

67.     When Dr. Ross received the allegedly final April Report, he was not provided with any of the schedules purportedly supporting the conclusions in the report.

68.     When the audit was publicly released on April 26, 2006, it was widely reported on by local, state, national, and international media.

69.     As a result of the public disparagement caused by the defamatory April Report, Dr. Ross' personal and professional reputation was irreparably damaged.

70.     Dr. Ross was publicly accused of wrongdoing for performing the same actions as other UW-Whitewater administrators similarly situated, none of whom, with the exception of Dr. Jones, were subjected to individual audits, public disparagement and/or adverse employment action.

71.     Although the audit was presented to the press and the public as final on April 26, the audit results were significantly altered after its release. Voluminous expenditures previously claimed to be misspent were altered and/or removed from the scope of the audit and various allegations of policy violations were rescinded and/or modified.

72.     In or about July 2006, Dr. Ross received a memorandum from UW-Whitewater Chancellor Martha Saunders (hereafter "July Memorandum") informing Dr. Ross that he would not be permitted to further challenge the audit conclusions. Saunders demanded that Dr. Ross reimburse UW-Whitewater for the purchases he made that allegedly violated university policies.

73.     The July Memorandum informed Dr. Ross that he could provide documentation and justification for purchases, and only those purchases found to violate university policies would require reimbursement.

74.     The July Memorandum also notified Dr. Ross that he could substantiate purchases made only in 2005, and proportionate amounts in prior years would be extrapolated from the 2005 purchases.

75.     Some of the schedules allegedly supporting the April Report were attached to Saunders's July Memorandum.  However, the July Memorandum rescinded certain allegations of policy violations that had been alleged in the April Report, including the allegations of improper "department store" purchases, "technology" purchases, and "miscellaneous" purchases.

76.     Upon receiving Saunders' memorandum and attached schedules, Dr. Ross reviewed the data in the schedules allegedly supporting the April Report.

77.     The schedules contained voluminous errors that were material, obvious, and blatant, including but not limited to the following and such other errors that may be determined attendant upon discovery in this action:

a)     In many instances, single purchases were included across multiple schedules, with the effect that voluminous purchases were counted multiple times and added to the total purchase amounts the April Report alleged Dr. Ross had spent;

b)     Dates of transactions were altered to disguise the fact that they were counted more than once.  For instance, for a transaction occurring on June 13, 2001, the date was transposed to reflect a separate purchase allegedly occurring on June 31, 2001, even though there are only 30 days in June.  Dates of other transactions were similarly manipulated;

c)      Educational testing software purchased for the university from a single vendor were variously classified as personal food purchases, personal book purchases, and miscellaneous purchases, all allegedly violating university policy;

d)      Academic conference registration fees were classified as department store purchases allegedly violating university policy;

e)      Office furniture purchased for the university by a secretary through the university accounts payable system was classified both as Dr. Ross's "personal technology purchase" and "personal department store purchase", allegedly violating university policy;

f)      Office supplies purchased by a secretary through the university's accounts payable system from the university's contracted office supply vendors were classified as being purchased by Dr. Ross on his purchase card, allegedly violating university policy.  The February 24, 2006 memorandum explicitly noted that the specified office supply vendors should be used for such purchases;

g)      Language lessons paid for through the university's accounts payable system were classified as being paid for by Dr. Ross on his purchase card, allegedly violating university policy;

h)      Purchases that had been previously credited back to the purchase card were included as policy violations and added to the total amounts that Defendants demanded Dr. Ross reimburse;

i)      Transactions that paid for expenses of other university administrators were ascribed to Dr. Ross and required to be reimbursed by Dr. Ross;

j)     Physics software purchased by a university faculty member was classified as a language learning expense alleged to have been purchased by Dr. Ross on his purchase card, allegedly violating university policy;

k)     University registration fees for the Modern Language Association were classified as both book purchases and department store purchases, allegedly violating university policy;

l)     Fees paid to the National Association of International Educators were classified as internet technology purchases, allegedly violating university policy;

m)     Classroom books were classified as travel expenses, allegedly violating university policy;

n)     Vendor names shown on receipts and purchase card statements were altered in the schedules, disguising the fact that single transactions were counted multiple times;

o)     Office and educational software purchased for the university was classified as personal income tax software, allegedly violating university policy;

p)     Train tickets for university travel were classified as personal food purchases and personal "investments", allegedly violating university policy;

q)     Scientific glassware for the chemistry department was classified as a personal department store purchase, allegedly violating university policy;

78.     In or about July 2006, Freer resigned as Vice Chancellor for Administrative Affairs.  Chancellor Saunders appointed Randy Marnocha as the interim Vice Chancellor.

79.     After Dr. Ross's demotion, Associate Dean Mary Pinkerton replaced him as Dean of the College of Letters and Sciences.

80.     At or about the time Saunders submitted the July Memorandum to Dr. Ross, Saunders assigned Randy Marnocha and Mary Pinkerton to manage the resolution of the audit and UW-Whitewater's claim for reimbursement.

81.     Upon information and belief, Marnocha and Pinkerton received continuing directives from Telfer on the substance and nature of the audit conclusions and claims for reimbursement.

82.     Dr. Ross notified the individual Defendants of a litany of errors, inaccuracies, and misstatements in the audit report and schedules.  Dr. Ross sent dozens of emails to Defendants indicating the precise errors that he had identified.

83.     Dr. Ross also made a concerted effort to investigate and locate receipts, invoices, and the location of physical items that had been identified in the audit as missing, and to substantiate purchases occurring up to six or seven years prior.  Dr. Ross communicated these matters through dozens of emails to the Defendants and other UW-Whitewater personnel.

84.     Dr. Ross identified numerous instances where purchases made on his purchase card were for expenses such as airline tickets, hotel expenses, and conference fees of other UW-Whitewater administrators who traveled with Dr. Ross or attended the same events.  None of the UW-Whitewater administrators whose expenses were paid on Dr. Ross's purchase card was an African-American.

85.     Dr. Ross notified the individual Defendants of the numerous instances where he was alleged to have violated university policies, requiring his reimbursement, by paying for the business expenses of other UW-Whitewater administrators.

86.     Defendants removed from the schedules the payments specific to non-African-American administrators, but continued to allege that payments specific to Dr. Ross were in violation of university policy. Upon information and belief, none of those other administrators was subject to reprimand, was required to reimburse the university, or suffered an adverse employment action of any kind.

87.     Defendants privately acknowledged the existence of material errors in the April Report, including multiple counting of single transactions, misclassification of transactions, and the inclusion of transactions unrelated to Dr. Ross's purchase card. The Defendants also privately acknowledged the inequitable application of university policies to Dr. Ross compared to white administrators.

88.     Defendants never issued any retraction of the false public accusations that had been made against Dr. Ross, nor provided process by which Dr. Ross could contest the false allegations in the audit.

89.     Dr. Ross made numerous open records requests to UW-Whitewater in an effort to obtain information and documentation specific to his audit, to identify whether other UW-Whitewater administrators' purchase card usage was consistent with his own, and to identify whether any other UW-Whitewater administrators had been subjected to the same treatment.

90.     In response to some of Dr. Ross's open records requests, UW-Whitewater claimed that Dr. Ross would have to advance the university thousands of dollars to pay

for substantive responses. Many of Dr. Ross's open records requests were ignored by UW-Whitewater and received no response, though Dr. Ross repeated the requests on several occasions. Other open records responses were evasive and ultimately did not substantively respond to Dr. Ross's requests.

91. On or about September 8, 2006, Marnocha and Pinkerton issued a memorandum (hereafter "September Memorandum") to Dr. Ross reiterating the demand for reimbursement. Amounts allegedly owed and categories of alleged violations had been altered from those contained in the April Report and the July Memorandum. Numerous transactions continued to be alleged as policy violations, but were now claimed to violate different policies than those reported in the April Report. Upon information and belief, the September Memorandum was issued at the direction of Telfer.

92. The September Memorandum also claimed that Pinkerton had recently located over $50,000 in receipts related to the audit.

93. After receiving the September Memorandum, Dr. Ross continued to identify material errors in the audit reports and corresponding schedules, and to notify the Defendants, Marnocha, and Pinkerton of blatant inaccuracies. Dr. Ross also continued to make open records requests for information and documents cited in the April Report but never provided to him.

94. The September Memorandum, consistent with the July Memorandum, maintained the rescission of allegations that Dr. Ross had violated university policy for alleged "Department Store" purchases or alleged "Office Supplies" purchases, contrary to the allegations in the April Report.

95.     On February 8, 2007, Dr. Ross filed his complaint with the Equal Rights Division of the State of Wisconsin Department of Workforce Development, alleging discrimination and retaliation against Defendant Board of Regents.

96.     On or about April 6, 2007, Marnocha and Telfer issued a memorandum to Dr. Ross renewing UW-Whitewater's reimbursement claim for the first time since the September Memorandum.  The memorandum of April 6, 2007 increased the amount Dr. Ross allegedly owed by falsely claiming that three schedules had been "overlooked" in the September Memorandum.  In fact, two of the schedules had been rescinded promptly after the April Report was issued and were never re-alleged until after Dr. Ross filed a charge of discrimination.  Upon information and belief, the third schedule did not exist at the time of the September Memorandum.  The renewed claim for reimbursement in April 2007 was immediately released to the media.

97.     The renewed claim for reimbursement was an act of further discrimination and retaliation against Dr. Ross for filing a complaint with the ERD.

98.     At no time since April 2007 have Defendants indicated to Dr. Ross that he owes any reimbursement for the alleged policy violations nor have Defendants taken any action to enforce their alleged claim for reimbursement, demonstrating an absence of good faith behind those allegations.

99.     The manner in which the alleged six-year audit was initiated and conducted violated the prescribed procedures, rules, regulations, and customs governing internal audits conducted at UW-Whitewater, including policies that require: (a) advance notification to an auditee of the nature, scope, and time period of an audit; and (b)

meetings between the auditee and auditor to allow mistakes and inaccuracies in an audit report to be corrected.

100. UW-Whitewater's audit charter calls for specific analytical procedures to be followed and applied by an auditor when conducting an internal audit, and requires internal auditors to follow professional standards governed by the Institute of Internal Auditors. The alleged audit conducted by the Defendants violated those standards in multiple ways, including but not limited to, violations of the standards concerning independence, objectivity, integrity, and accuracy.

101. Mohabir, following direction from Telfer and Freer, deliberately employed inadequate audit procedures in violation of University policy and professional standards for internal auditing in an effort to avoid an accurate and reasonable analysis that would vindicate Dr. Ross of alleged financial impropriety.

102. The April Report, subsequent revisions, and claims for reimbursement were all released to the public, irreparably damaging Dr. Ross's reputation and career.

103. Defendants made concerted efforts to have the audit, which they knew or should have known contained false information, released publicly in order to damage Dr. Ross's professional reputation and standing in the community and create false grounds for his dismissal.

104. The release of the audit and its contents were heavily reported on by the local, state, and national media, causing Dr. Ross to suffer public humiliation, irreparable damage to his reputation and career, and extreme emotional distress.

105. The six-year audit, April Report, and Dr. Ross' termination were part of an unlawful conspiracy, agreed to and carried out by Defendants Telfer, Freer, and

Mohabir, which failed to serve any legitimate university purpose and which led to a deprivation of Dr. Ross's constitutional rights.

106.    No other person similarly situated to Dr. Ross, who was not an African-American, was subjected to such acts of scrutiny, harassment, and public humiliation.

107.    The audit and other related acts described in this Complaint were both a pretext for and an act of unlawful discrimination against Dr. Ross.

108.    Dr. Ross's termination as dean was an adverse employment action which was unlawfully motivated by race discrimination and retaliation for publicly criticizing discrimination occurring at UW-Whitewater.


## V.  Violations of Law

109.    Defendant Board of Regents and the individual Defendants in their official capacities subjected Dr. Ross to unlawful discrimination and retaliation in employment on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

110.    Defendants Telfer, Freer, Mohabir, and Saunders, individually and in their official capacities, acted with color and authority of state law to violate the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution by subjecting Dr. Ross to disparate treatment and deprivation of property and liberty without due process of law on the basis of race and color, contrary to 42 U.S.C. § 1983.

111.    Defendants Telfer, Freer, Mohabir, and Saunders, individually and in their official capacities, acted with color and authority of state law to violate the First

Amendment to the United States Constitution by intentionally depriving Dr. Ross of his rights to freedom of speech and intentionally retaliating against him for exercising his free speech rights, contrary to 42 U.S.C. § 1983.

112.    Defendants Telfer, Freer, and Mohabir conspired to deny Dr. Ross of the equal protection of the laws guaranteed to him under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution on the basis of his race and color, and one or more of said Defendants did commit an overt act in furtherance of the conspiracy, contrary to 42 U.S.C. §1985(3).


## VI.  Damages

113.    As the direct and proximate result of Defendants' unlawful actions, Dr. Ross has sustained injury in the nature of loss of income and benefits, loss of future earnings and earning capacity, extreme emotional distress, mental anguish and despair, humiliation, loss of reputation, and loss of his chosen career.

114.    As the further direct and proximate result of Defendants' unlawful acts, Dr. Ross has been caused to suffer the loss of rights, privileges and immunities guaranteed to him under the Constitution and laws of the United States.


## VII.  Demand for Jury Trial

115.    Dr. Ross demands a trial by jury as to all issues triable of right to a jury.

### VIII.  Prayer for Relief

WHEREFORE, Plaintiff Dr. Howard L. Ross prays that this Honorable Court against the Defendants, jointly and severally, award him:

    a.  Judgment for compensatory damages;

    b.  Judgment for punitive damages;

    c.  Plaintiff's costs and disbursements including actual attorneys' fees; and

    d.  Such other and further relief as this Honorable Court deems appropriate.

Dated this 13th day of March, 2008.

    \_s/ Robert J. Kasita_____
Robert J. Kasieta, WI State Bar No. 1000107
Andrew J. Parrish, WI State Bar No. 1060071
Attorneys for Plaintiff Dr. Howard L. Ross
KASIETA LEGAL GROUP, LLC
7818 Big Sky Drive, Suite 112
Madison, WI 53719
Telephone: (608) 662-9999
Fax: (608) 662-9977
E-mail: rjkasieta@kasieta.com