# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

HOWARD L. ROSS,

                Plaintiff,

     v.                                  Case No. 08-CV-230

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
RICHARD J. TELFER, JAMES W. FREER,
INDRA MOHABIR and MARTHA D. SAUNDERS,

                Defendants.

_____

# ORDER

On March 14, 2008, Howard L. Ross ("Ross") filed a summons and complaint against the Board of Regents of the University of Wisconsin System ("Board of Regents"), as well as four current or former administrative officials at the University of Wisconsin - Whitewater ("UWW"). The complaint alleges the following: (1) that defendants unlawfully discriminated and retaliated against Ross in his employment on the basis of race in violation of Title VII of the Civil Rights Act of 1964; (2) that defendants Richard J. Telfer ("Telfer"), James W. Freer ("Freer"), Indra Mohabir ("Mohabir") and Martha D. Saunders ("Saunders") acted under color of state law to deprive Ross of equal protection and due process of law under the Fourteenth Amendment, in violation of 42 U.S.C. § 1983; (3) that Telfer, Freer, Mohabir, and Saunders acted under color of state law to violate the First Amendment by retaliating against Ross for exercising his free speech rights, also in violation of 42 U.S.C. § 1983; and (4) that Telfer, Freer and Mohabir conspired to deny Ross equal

protection of the laws under the Fourteenth Amendment in violation of 42 U.S.C. § 1985(3).

On April 9, 2008, defendants filed a joint answer and the Board of Regents asserted counterclaims against Ross for breach of fiduciary duty and intentional misrepresentation. On February 16, 2009, Ross filed a motion for summary judgment on the Board of Regents' counterclaims. (Docket # 31). On February 17, 2009, defendants filed their own motion for summary judgment on the claims asserted in Ross's complaint. (Docket #37). Ross also filed two motions to strike portions of several affidavits submitted by defendants. Before addressing these motions, the court reviews the background facts of this case.

## BACKGROUND

Ross, an African-American male, joined UWW as dean of the college of letters and science and professor of philosophy and religious studies in 1993. (Plaintiff's Proposed Findings of Fact ("PPFF") ¶ 15, Docket #33; Plaintiff's Additional Proposed Findings of Fact ("PAPFF") ¶ 1, Docket ##'s 57, 83). As dean, Ross acted as the administrative head of the college of letters and sciences, managing an annual budget of $11 million. (PPFF ¶ 17; Defendants' Additional Proposed Findings of Fact ("DAPFF") ¶ 28, Docket #70). The controversy in this case stems from Ross's use of a university credit card known as a procurement card ("procard"). (PAPFF ¶ 21).

-2-

In the mid-nineties, UWW began issuing procards to its administrators and faculty to streamline the procurement process for smaller purchases of goods and services. (PAPFF ¶¶ 21, 23).[1] Procards generally had a $5,000.00 credit limit, and administrators could use their procards like a credit card to make purchases without preapproval from UWW's purchasing department. (PAPFF ¶ 23). Procard holders were required, however, to keep a purchase log along with the original receipts and invoices, and to reconcile the purchase log with monthly billing statements generated by the credit card company which issued the procard. (PAPFF ¶¶ 25-26). Ross received his procard in 1996. (PPFF ¶ 32). Soon after acquiring the procard, Ross authorized several staff members in his office to use the procard, and delegated responsibility for monitoring procard purchases to the associate dean, Mary Pinkerton ("Pinkerton"). (PPFF ¶ 34; PAPFF ¶¶ 30, 33). Therefore, it was Pinkerton who actually kept the procard purchase log and reconciled logged purchases with the monthly billing statements.[2] (PAPFF ¶¶ 32, 34).

In 1999, UWW created an internal audit department to act as an independent reviewer of university finances. (PAPFF ¶ 39; Defendants' Proposed Findings of Fact ("DPFF") ¶ 17, Docket #39) The internal audit department was meant to operate independently of other UWW departments, and reported directly to the UWW chancellor and administrators. (DPFF ¶¶ 17, 18; PAPFF ¶ 41). Freer, then

---

[1] For larger purchases, administrators needed to go through UWW's purchasing department for preapproval and processing. (PAPFF ¶ 19).

[2] Pinkerton became associate dean of the college of letters and sciences in 1998. (PAPFF ¶ 32).

vice chancellor for administrative affairs at UWW, had oversight authority over the audit department, and helped create a charter and policies to govern audit procedures at the university. (DPFF ¶ 6; PAPFF ¶¶ 40-41). According to a document purporting to be UWW's internal audit charter and policies, a copy of which Ross's expert attached to his report, UWW policies required that an audit be a collaborative effort between the auditor and management of the audited department. For example, the auditor was to provide notice to each department to be audited before commencing an audit. (PAPFF ¶ 43). The policies also required that the auditor set up an entrance conference with managers of the department to be audited, and conduct interim meetings with officials of the audited department to provide updates on the audit findings. (PAPFF ¶¶ 42-46). The policies further state that the auditor should provide a draft of the audit report to appropriate managers of the audited department, hold an exit conference with those officials, and provide thirty days for personnel of the audited department to respond to the draft report. (PAPFF ¶¶ 47-50). Finally, the policies state that the final audit report was to include any revisions made by the auditor, as well as any responses to the auditors recommendations made by the audited department. (PAPFF ¶ 51; Marrasco Aff. Ex. C, Docket #58).

Around the same time the internal audit department was set up, UWW began to conduct a series of audits of its operations. In 1999, UWW conducted an internal audit of procard use throughout the university. (PPFF ¶ 35; PAPFF ¶ 53; DPFF

Case 2:08-cv-00230-JPS   Filed 09/03/09   Page 4 of 50   Document 103

¶ 19). The 1999 audit report found several procard holders, including Ross, to be non-compliant with UWW procard policies on purchases and record keeping. (PAPFF ¶ 54). The 1999 report found that Ross had improperly allowed Wisconsin sales tax totaling $1.64 to be charged on tax-exempt procard purchases. (PPFF ¶ 36; PAPFF ¶ 57; DPFF ¶ 19).

In 2000, the internal audit department conducted further audits of all UWW departments to verify procard holders were following UWW record keeping requirements. (DPFF ¶ 20; PPFF ¶ 39). Ross's procard was again among those audited. (PPFF ¶ 39). The 2000 audits revealed improper record keeping and purchases on multiple procards. (PAPFF ¶ 60). While Ross claims to have never received the 2000 audit report, Ross admits that he received two memoranda identifying procard purchases for which the auditor requested further documentation. (DPFF ¶ 22; PPFF ¶¶ 40-41; PAPFF ¶ 63). Ross met with Freer and Michael Klink ("Klink"), who was at that time UWW's internal auditor, to discuss the results of the 2000 audit. (DPFF ¶ 16; PPFF ¶ 42). Ross also provided at least two written responses explaining the undocumented purchases noted in the 2000 audit report. (PPFF ¶ 43; PAPFF ¶ 64; DPFF ¶ 26). In his correspondence with the internal audit department, Ross stated that he would make sure that receipts were provided for every procard purchase in the future. (DPFF ¶ 23). After the 2000 audit was completed, Klink sent a memo to Ross informing him that he would continue to monitor Ross's procard purchases over the next few months to ensure compliance

Case 2:08-cv-00230-JPS   Filed 09/03/09   Page 5 of 50   Document 103

with UWW's record keeping rules, and that he would report the results of his monitoring to the chancellor and provost. (DPFF ¶¶ 24-25; PPFF ¶ 45). The parties dispute whether Ross adequately addressed all of the recommendations and record keeping deficiencies cited in the 2000 audit report.

In 2003, the administrator of UWW's procurement card program, Mike Hirschfield ("Hirschfield"), conducted what defendants call a "comprehensive review" of procard holders in the college of letters and sciences. (DPFF ¶ 30; PPFF ¶ 46; PAPFF ¶ 67). As part of that review, an auditor interviewed Pinkerton, presumably to obtain information on the use of Ross's procard. (PPFF ¶ 47; PAPFF ¶ 68). The results of the review were summarized in a report, which was provided to Pinkerton. (PPFF ¶ 48; PAPFF ¶ 71). The report found that records documenting Ross's procard purchases were inadequate, and that Ross's procard had charges for individual meals and sales tax that did not comply with UWW procard policies. (PPFF ¶ 50; PAPFF ¶ 69; DPFF ¶ 30). The administrator responsible for the review, however, concluded that overall procard compliance was "good." (PAPFF ¶ 70). After the 2003 review, Ross was not disciplined by UWW officials in any way, and he kept his procard. (PPFF ¶ 51).

In 2004, Hirschfield conducted another audit of Ross's procard purchases as part of a routine audit of the dean's office. (PPFF ¶ 52; DPFF ¶ 31). As part of the audit, Pinkerton was interviewed again, and an audit report was generated. (PPFF ¶ 53; PAPFF ¶ 79). The 2004 report found that record keeping for purchases made

on Ross's procard was not compliant with UWW policies, including charges related to Ross's cell phone service, alcohol purchases, upgraded hotel rooms, flowers, and On-Star service.[3] (PPFF ¶ 56). On December 21, 2004, Hirschfield sent a memorandum to Randy Marnocha ("Marnocha"), then an associate vice chancellor, recommending "removal" of Ross's procard for "non-compliance purchasing." (PPFF ¶ 59; PAPFF ¶ 80). Around the same time, Freer was also made aware of Hirschfield's findings and recommendation. (DPFF ¶ 31).

Sometime between December of 2004 and January of 2005, Freer met with UWW's provost and vice chancellor for academic affairs, Telfer, to discuss the results of the 2004 review. (PPFF ¶¶ 60, 62; DPFF ¶ 3). Telfer was Ross's direct supervisor, and had conducted annual reviews of Ross's performance from 2002 through 2005. (DPFF ¶ 3). Freer apparently did not believe that the findings in 1999, 2000, 2003, or 2004 provided sufficient grounds for rescinding Ross's procard or taking other disciplinary action against Ross. (PAPFF ¶ 92). Instead, Freer recommended to Telfer that the UWW auditor conduct a further audit of Ross's procard expenditures going forward. (DPFF ¶ 32). Telfer agreed to this special audit, which was to cover the six month period from January to June of 2005. (PPFF ¶ 64; DPFF ¶ 32).

---

[3] Although never explained by the parties' submissions, the court notes that "On-Star service" appears to refer to the electronic car safety and security device installed in certain vehicles manufactured by General Motors. *See* OnStar by GM, http://www.onstar.com/us_english/jsp/index.jsp (last visited July 23, 2009).

By 2005, Mohabir had taken the reigns as director of UWW's internal audit department, and Telfer and Freer put her in charge of the special audit. (DPFF ¶¶ 7, 35). Before commencing the special audit, Mohabir conducted an unrelated audit of cellular telephone usage by personnel at UWW. (PAPFF ¶ 105). The cell phone audit was triggered by a change in Wisconsin's policy on cellular phone usage by state government agencies. (PAPFF ¶¶ 105-06). Ross became entangled in Mohabir's cell phone audit not only because he used a cell phone paid for by UWW, but also because his cell phone service provider was not the university's preferred service provider. (PAPFF ¶¶ 109-110). In 2000, Ross had been instructed by UWW officials to migrate his cell phone service over to the state-contracted service provider when his cell phone became unusable. (PAPFF ¶ 111). Ross had yet to change service providers when Mohabir asked Ross to provide her with his cell phone billing records. (PAPFF ¶ 115). Ross eventually provided the billing records, although Mohabir claims they were inadequate. (PAPFF ¶ 115). In June of 2005, Mohabir issued a report making multiple general findings on the adequacy of UWW policies governing cell phone usage or charges. (PAPFF ¶ 117). Although Ross's name was never mentioned in the report, the parties seem to agree that Mohabir questioned the appropriateness of Ross's cell phone usage in the report. (PAPFF ¶¶ 119-22).

In July of 2005, Ross decided to voluntarily relinquish his procard. (PAPFF ¶ 130). Ross claims he did so because he felt that Mohabir had harassed him

Case 2:08-cv-00230-JPS   Filed 09/03/09   Page 8 of 50   Document 103

during the cell phone audit, and he wanted to avoid any further contact with her. (PPFF ¶ 66; PAPFF ¶ 131). But it was not just Mohabir's conduct in completing the cell phone audit that caught Ross's attention. By that time, Ross had heard about Mohabir's encounters with Lee Jones ("Jones"), dean of UWW's college of graduate studies and continuing education. (PAPFF ¶ 17). In June of 2005, Mohabir participated in an individual audit of Jones, who was the only other African-American dean at UWW.[4] (PAPFF ¶ 136). According to Jones, Mohabir barged into his office one day and demanded he show her several documents for the audit. (PAPFF ¶ 137). Jones claims Mohabir was hostile towards him throughout the audit process, and that at one point, while in his office, Mohabir pointed to a poster of basketball great Michael Jordan on the wall and stated that she wished all black people could be honest like Jordan. (PAPFF ¶¶ 138-39). Mohabir admits that she commented on the Michael Jordan poster, but claims she only remarked that Jordan seemed "like a very honest guy," and that she wished "more people were like him." (DPFF ¶ 79). Jones claims that he complained to Telfer and Saunders, then the chancellor of UWW, about Mohabir's conduct, but that Telfer told him that he could not make any formal complaint because the university did not have an affirmative action director. (PAPFF ¶ 141-42).

---

[4] According to an affidavit from defendants' counsel, Mohabir did not conduct the audit on Jones. However, defendants cite no evidence to support their contention other than counsel's bare assertion. (Sahar Supplementary Aff. ¶ 4, Docket #78).

Case 2:08-cv-00230-JPS   Filed 09/03/09   Page 9 of 50   Document 103

In August or September of 2005, Mohabir began the special audit of Ross's procard usage. (PPFF ¶ 67). Things did not start off on a good note. Mohabir stopped by Ross's office unannounced, when neither Ross nor Pinkerton were present, and immediately began inspecting the office, including Ross's bags and personal belongings.[5] (PAPFF ¶¶ 150-51). Despite this, Ross claims that he immediately cooperated with Mohabir's demands. Ross collected certain materials Mohabir had inquired about, and instructed his staff to provide Mohabir with access to any documents she requested. (PAPFF ¶¶ 158-60). At one point, Ross claims that he asked Mohabir point blank why he and Jones were the only deans being audited, and Mohabir responded that only black deans were being audited because the white deans were more honest. (PAPFF ¶ 161). Mohabir denies ever saying this to Ross.

Ross claims that he told Telfer and Freer about Mohabir's harassing conduct and racially charged comments, but to no avail. (PAPFF ¶¶ 163). By late November of 2005, it seems that Ross had had enough. Although he apparently did not know the scope of the special audit at the time, Ross spoke with a member of the media and publicly expressed his concerns that he and Jones were being subjected to discriminatory and unprofessional audits. (PAPFF ¶¶ 166-67). In mid-December, open records requests had come in to UWW officials seeking copies of all audit reports covering Ross's tenure as dean. (PAPFF ¶ 171). Freer informed Ross of

---

[5] Staff in the dean's office would later compare Mohabir's conduct in the office to that of the Gestapo in Nazi Germany. (PAPFF ¶ 153).

-10-

the open records requests, and later released to the media the 2000, 2003, 2004 audit reports, and portions of the 1999 report. (PAPFF ¶ 173). Mohabir continued the audit, and soon decided, in consultation with Freer, to expand its scope beyond the original six-month window to cover expenditures from as early as 2000. (DPFF ¶ 41; PPFF ¶ 71; PAPFF ¶¶ 176-77).

While conducting the special audit, Mohabir told Freer that she was finding it difficult to access all the records she felt were needed to audit Ross's procard account. (DPFF ¶ 45). On February 24, 2006, Mohabir drafted a memorandum to Telfer outlining the deficiencies in Ross's procard records in February of 2006. (DPFF ¶ 56; PPFF ¶ 79). Telfer in turn provided a copy of the memo to Ross at a meeting held on February 27, 2006. (PPFF ¶ 79-80). This was the first time Ross claims that he learned Mohabir's audit covered years 2000 through 2006. (PPFF ¶ 81). At that meeting, Telfer told Ross to respond to the memo. (PPFF ¶ 82). On March 1, 2006, Ross responded to some extent, although Mohabir was not satisfied. (PPFF ¶ 85).

Soon thereafter, Mohabir provided the first draft of the special audit report to Freer. (DPFF ¶ 57). This effectively ended Mohabir's involvement in drafting the report. (PAPFF ¶ 182). From that point on, Freer took the lead in drafting the report, in consultation with an audit official from the University of Wisconsin System.[6] (DPFF ¶ 59, 63-68). On March 27, 2006, Ross received a draft of the audit report

---

[6]The University of Wisconsin System is the administrative body overseeing Wisconsin's public colleges and universities. (PPFF ¶ 2)

along with a memorandum soliciting his response to the report by April 3, 2006. (PPFF ¶ 87). Ross responded to the report with hundreds of emails to Freer, Telfer and other UWW officials pointing out what he considered to be errors in the report. (PPFF ¶ 88). Ross claims that his emails fell on deaf ears, and that none of the errors he pointed out were addressed in the final report. (PPFF ¶ 89).

By mid-March, Saunders took notice of the special audit. Saunders met with Ross before the audit was finalized and encouraged Ross to resign as dean.[7] (PAPFF ¶ 196). Ross refused, claiming that he had done nothing wrong, and that the audit was fundamentally flawed. (PAPFF ¶ 198). Ross claims that he informed Saunders that he believed Mohabir's conduct during the audit was inappropriate. (PAPFF ¶ 198). Saunders, however, denies that she knew at the time about the allegations of racial bias leveled against Mohabir.

By April 19, 2006, Freer had completed the final audit report. (PPFF ¶ 90; DPFF ¶ 69). The final report was formatted in four separate sections. The first section of the report found that Ross had failed to properly track expenses and made purchases that were not in compliance with UWW policies and procedures. (PPFF ¶ 91). In that regard, the report recommended that Ross reconstruct documentation for all procard purchases totaling $310,325 from fiscal years 2000 through 2005. (DAPFF ¶ 1; Parrish Aff. Ex. A, Docket #34). The second section of the report outlined "inappropriate business expenditures," which included Ross's cell phone

_____

[7]Telfer had recommended to Saunders that she offer Ross an increased faculty salary as an incentive for his resignation. (PAPFF ¶ 197).

service charges, expenses related to French language classes, gift and alcohol purchases, charges for XM satellite radio service in Ross's office, and charges from the singles website Yahoo Personals. The third section of the report outlined "expenditures lacking appropriate documentation," which included purchases of books and periodicals, computers and peripherals, department store purchases, online internet music purchases, fees for internet services, as well as purchases from the movie rental service Netflix. The fourth and final section of the report discussed Ross's procard purchases for travel-related expenses. In that section, the report found that Ross had improperly charged meal and telephone expenses, had failed to fill out travel approval forms or keep sufficient documentation, had improperly purchased certain airline tickets, and had exceeded set rates for hotel room stays. (Parrish Aff. Ex. A, Docket #34).

On April 26, 2006, Saunders stripped Ross of his position as dean, claiming that she had lost confidence in Ross's ability to effectively lead the college of letters and sciences. (DPFF ¶ 76; PPFF ¶ 97). Ross was allowed to keep his position as professor at UWW. (PAPFF ¶ 234). That same day, Saunders ordered her staff to release the special audit report to the media. (PAPFF ¶ 236). Saunders then appointed Pinkerton to replace Ross as dean of the college of letters and sciences. (PPFF ¶ 98).

Ross's demotion was not the end of the story, however. In July of 2006, Saunders sent at least one memorandum to Ross asking that he work to address the

issues raised in the special audit report. (PAPFF ¶ 281). Defendants claim that Saunders's follow-up memos were part of a post-audit investigation to determine what, if any, amounts Ross personally owed to the university as a result of his past procard purchases. (DAPFF ¶¶ 23-24). Ross further claims that he continued to cooperate with university officials by providing explanations for the procard purchases cited in the audit report, and by pointing out errors in the report. (PPFF ¶ 109). From July of 2006 through April of 2007, Ross and various UWW officials continued a back-and-forth exchange of correspondence relating to how much Ross might owe for improperly charged procard purchases. In an April 6, 2007 memo, Telfer and Marnocha concluded that Ross owed UWW $117,155.90 for purchases that they claimed Ross had failed to justify. (DAPFF ¶¶ 8-9).

On February 8, 2007, Ross filed a complaint with the Equal Rights Division of Wisconsin's Department of Workforce Development ("ERD"). On or about December 28, 2007, the ERD issued Ross a right to sue letter. (Compl. ¶ 14, Docket #1).

## ANALYSIS

Summary judgment is warranted where the moving party establishes that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those facts that "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact

-14-

could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing summary judgment must set forth specific facts showing the existence of a genuine issue for trial, and may not rely on allegations or denials of the adverse party's pleading. Fed.R.Civ.P. 56(e). In conducting its review, the court views all facts and draws all reasonable inferences in favor of the nonmoving party. *See Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

## 1.    Defendants' Motion for Summary Judgment

The court begins with defendants' motion for summary judgment. In support of their motion, defendants assert that Ross's race discrimination claims cannot stand because Ross has failed to prove that his demotion was unlawfully motivated or pretextual under either Title VII or § 1983. With respect to Ross's due process claim, defendants assert that it fails because Ross had no property right in retaining his deanship. With respect to Ross's retaliation claims, defendants argue that Ross has failed to show the requisite causal link between any protected speech and his demotion. And finally, with respect to Ross's conspiracy claim under § 1985, defendants assert that Ross has failed to demonstrate any agreement between

-15-

Telfer, Freer and Mohabir to discriminate against Ross. The court considers each of Ross's claims in turn.

### A. Title VII Discrimination Claim

In his complaint, Ross alleges that defendants unlawfully discriminated against him on the basis of his race by conducting the special audit of his procard usage and demoting him from his position as dean. Ross alleges that defendants' conduct violated Title VII.

To succeed in an intentional discrimination claim under Title VII, a plaintiff must show that the defendant discriminated on the basis of sex, race, color or national origin, and that the discrimination resulted in a materially adverse employment action. *Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 730 (7th Cir. 2009); *see also* 42 U.S.C. § 2000e-2(a)(1). Materially adverse employment actions include those affecting the plaintiff's compensation, career prospects or work conditions. *Id.* (citation omitted). To avoid summary judgment, a plaintiff must either put forth sufficient direct or circumstantial evidence of discriminatory motivation to create a triable issue, or establish a prima facie case under the framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007).

Under the direct method of proving a Title VII discrimination claim, a plaintiff may present either direct or circumstantial evidence of discriminatory motive or intent. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Direct

-16-

evidence is evidence that, if believed, would prove the fact in question without need for inference or presumption. *Id.* Direct evidence is essentially "an acknowledgment of discriminatory intent by the defendant or its agents." *Walker v. Bd. of Regents of Univ. of Wis.*, 410 F.3d 387, 394 (7th Cir. 2005) (quoting *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994)). On the other hand, circumstantial evidence is evidence that would allow a trier of fact to infer that the decisionmaker acted with intent to discriminate. *Rogers*, 320 F.3d 753. The Seventh Circuit has identified three types of circumstantial evidence relevant to Title VII discrimination claims: (1) evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) evidence "that employees similarly situated to the plaintiff . . . received systematically better treatment"; or (3) "evidence that the plaintiff was qualified for the job in question but [replaced by] a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Walker*, 410 F.3d at 394.

Here, Ross purports to have direct evidence of discriminatory motivation. Upon close inspection, however, it misses the mark. Ross claims that Mohabir's alleged admission to Ross that only black deans were being audited because the white deans were more honest is direct evidence of discrimination. While Mohabir denies making that particular comment, she does admit to making a rather bizarre

-17-

comment to Jones that she wished more people were honest like Michael Jordan. Indeed, when viewed in a light most favorable to Ross, Mohabir's comments could demonstrate that racial animus drove her actions in conducting the special audit of Ross's activities. However, Mohabir's alleged comments, if true, do not directly establish that Saunder's ultimate decision to demote Ross was also motivated by racial animus.

This raises the important collateral question of what the material adverse employment actions could be in this case. In general, a materially adverse employment action must be "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (outlining general types of materially adverse employment actions). Ross has failed to convince the court that being subject to an audit by one's employer, even if it is conducted in a disruptive and unfair manner, is sufficient to rise to the level of a materially adverse employment action under Title VII. Therefore, Ross's Title VII discrimination claim must arise from his demotion, which defendants do not dispute could be considered a materially adverse employment action. On that front, Ross has presented no direct evidence establishing that Saunder's ultimate decision to demote him was based on racial animus. Instead, Ross has proffered only circumstantial evidence, which the court must next consider.

Ross directs the court to various circumstances surrounding his demotion from which he claims a trier of fact could reasonably find impermissible discrimination.

-18-

Ross's circumstantial evidence seems to fall within the Seventh Circuit's suspicious timing and behavior category. Ross claims that Mohabir's comments along with other evidence establishes that defendants intentionally targeted only the two black deans at UWW for demotion. There is some circumstantial evidence that supports this theory. Freer, who served as vice chancellor for administrative affairs between 1989 and 2006, testified at his deposition that the special audits targeting Ross and Jones were the only audits he could recall that were ever directed at a specific dean at UWW. (PAPFF ¶ 52; Freer Dep. 26:4-27:19, Aug. 6, 2008, Parrish Aff. Ex. C, Docket #34). Ross claims that the timing of these special audits is also important. Both audits came on the heals of Saunders's arrival as chancellor of UWW. Under Ross's theory, Telfer and Freer intentionally delayed the special audit of Ross so that they could more effectively control the audit process and ensure their desired result. Ross also claims that discriminatory intent could be inferred from the fact that defendants did not follow their own audit policies and that, according to Ross's retained accounting expert, Mohabir failed to follow general industry standards for internal audits. Ross also claims that Telfer, Freer and Mohabir have offered different stories about their motivation for auditing Ross. Specifically, Ross claims that Telfer, Freer and Mohabir have provided inconsistent and vague statements on precisely why and when the special audit was ordered or who first recommended it. Finally, Ross claims that the special audit report contains materially false allegations,

and that defendants have destroyed or tampered with documents that could have definitively proven the falsity of the report.

While much of defendants' brief in support of their motion focused on the indirect *McDonnell Douglas* analysis of Ross's discrimination claim, their reply brief provides some response to Ross's assertion that he has presented direct, rather than indirect, proof of discriminatory motive. Defendants assert that Ross has failed to produce any evidence that Saunders was herself motivated by racial animus when she demoted Ross, and that the conduct and motivations of Mohabir, Telfer or Freer cannot be imputed to her.

Defendants are correct that, normally, conduct and statements of nondecisionmakers demonstrating racial animus cannot be imputed to the decisionmaker. Yet, the Seventh Circuit has recognized an important exception to this rule:

> . . . [W]here an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her "singular influence" over an employee who does have such power to harm the plaintiff for racial reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII.

*Brewer v. Bd. of Trustees of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007). A nondecisionmaker may exercise singular influence over a decisionmaker where the decisionmaker is totally dependent on the nondecisionmaker, and the nondecisionmaker supplies misinformation or fails to provide relevant information. *Id.* at 917-18.

-20-

On the basis of the record before it, the court finds that a reasonable fact finder could conclude that Mohabir, Telfer and Freer exercised singular influence over Saunders with respect to the findings in the special audit such that Saunders became totally dependent on them. A trier of fact could also reasonably infer from Mohabir's own words, or at least two separate accounts of her words, that Mohabir believed black people were more dishonest than white people, and that Mohabir acted on her stated racial prejudice, rather than the facts, in making findings found in the special audit report. Mohabir performed the field work for the special audit and, therefore, had the opportunity to collect and report the underlying information for the audit in a manner she chose. If a trier of fact were to believe that Mohabir was acting out of racial animus, the same reasonable fact finder could conclude that Mohabir funneled misinformation to Saunders via Freer and Telfer, and that Saunders relied on that underlying misinformation in making her decision to demote Ross. What is more, Ross has presented evidence that Saunders, Telfer and Freer were actually told of Mohabir's alleged comments which reflected her racial bias before deciding to demote Ross.

To be sure, defendants have presented their side of the story with evidence suggesting that the special audit was accurate and justified given a well-documented history of Ross's noncompliance with UWW procard usage policies. Defendants have also presented testimony from Saunders, Freer and Telfer that tends to show Saunders may not have been singularly influenced by Mohabir in her decision to

demote Ross. For example, Saunders claims that the special audit was not necessarily the only reason she demoted Ross. But much of the evidence presented on both sides of this case hinges largely on the credibility of witnesses. Such assessments are best left for trial. Therefore, because genuine issues of material fact remain, the court is obliged to deny defendants' motion for summary judgment on Ross's Title VII discrimination claim.

While the court has principally considered Ross's discrimination claim under the direct method of proof, it is equally viable under the indirect method. Under the indirect method, also known as the *McDonnell Douglas* analysis, Ross would first need to show that he is a member of a protected class, that he was qualified to be dean of the college of letters and sciences and that he was demoted and replaced as dean by a person who was not part of the same protected class and not better qualified. *See Nichols*, 510 F.3d at 783. Ross has met this initial burden. As a black male, Ross is a member of a well-recognized protected class of individuals who have traditionally suffered from racial discrimination. Ross has also made a showing that he was qualified to continue as dean. Perhaps the most obvious evidence of Ross's qualifications is the fact that he led UWW's college of letters and sciences for over fifteen years. Telfer, who reviewed Ross's performance annually prior to his demotion, admits that Ross was performing well by some measures. (PAPFF ¶¶ 86-87). In fact, Telfer approved the issuance of a new credit card to Ross for travel expenses in September of 2005. (PPFF 73-74). There is also no

-22-

dispute that Ross's replacement, Pinkerton, is a Caucasian female rather than a black male. With respect to Pinkerton's qualifications as compared to Ross's, she does not appear to have been more qualified than Ross. In fact, as associate dean, a juror could reasonably conclude, based on the evidence, that Pinkerton shared some of the responsibility for any deficiency in the record keeping for procard expenditures within the dean's office. Therefore, the court finds that Ross has established a prima facie case under the indirect method of proof.

Relatedly, defendants assert that Ross has failed to show that any similarly situated UWW employees were treated more favorably. It is true that the plaintiff, claiming disparate treatment under Title VII, must show the employer treated similarly situated coworkers who were not members of the same protected class more favorably. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002). Ross has made this showing. Defendants do not dispute that procard usage reviews and audits dating back to 1999 found that other departments were noncompliant with UWW procard usage policies. Yet, Ross was apparently one of only two deans in the previous twenty years at UWW to have been individually targeted for a special audit. Defendants claim that other deans at UWW were not similarly situated to Ross because they did not have a history of noncompliance with UWW procard rules. But defendants all but ignore Ross's allegation that Pinkerton, Ross's successor as dean, was similarly situated to him but was treated more favorably after the special audit. Despite the fact that Ross delegated the task of maintaining

procard purchase logs and records for his procard to Pinkerton, and that the special audit found certain documentation for Ross's procard purchases to be inadequate, Pinkerton not only escaped disciplinary actions, but received a promotion. Accordingly, the court finds that Ross has adequately demonstrated that similarly situated UWW employees not of the same protected class were treated more favorably. *See Peele*, 288 F.3d at 330 (holding that an employee similarly situated is one who is directly comparable in all material respects).

In the second step of the *McDonnell Douglas* analysis, the burden shifts to defendants to set forth a legitimate, nondiscriminatory reason for demoting Ross. *Nichols*, 510 F.3d at 783. Defendants claim that their nondiscriminatory reason is that Saunders had lost confidence in Ross's ability to serve effectively as dean because of his persistent noncompliance with procard policies. (DPFF ¶ 76). Saunders testified at her deposition that the special audit influenced her decision to demote Ross. She also testified that Ross had made other decisions as dean that she disagreed with, but she did not elaborate on the exact nature of those disagreements. (Saunders Dep. 38:1-39:4, Aug. 25, 2008, Parrish Aff. Ex. D, Docket #46). The court finds that defendants have met their burden in putting forth a legitimate nondiscriminatory reason for demoting Ross.

In the final step of the *McDonnell Douglas* analysis, Ross must demonstrate that defendants' proffered reason for demoting him was a mere pretext for discrimination, or that the employment "decision was tainted by impermissible, race-

based motives." *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 643-44 (7th Cir. 2006) (quoting *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 897 (7th Cir. 2003)). Showing pretext requires more than an employer's mistake; it is a lie or a phony excuse. *Id.* at 644. Defendants argue that Ross was responsible for keeping records of his procard purchases, and that he failed to carry out his record keeping duties. This, however, is genuinely disputed. Ross claims that he complied with procard usage rules, but that Mohabir distorted past findings of noncompliance and misstated findings of continuing noncompliance in the special audit report. Viewing the evidence in a light favorable to Ross, the court finds that Ross has provided sufficient evidence to establish that defendants' proffered justification for demoting Ross was a mere pretext because Saunders based her decision on Mohabir's potentially false or misleading audit findings. As the court discussed above, an ultimate finding of pretext would require the finder of fact to infer that Mohabir was motivated by racial animus towards blacks and that Telfer and Freer willfully ignored Mohabir's motivations or were similarly motivated. Therefore, Ross's Title VII discrimination claim may proceed to trial.

### B.    § 1983 Equal Protection Claim

In the complaint, Ross also alleges that Freer, Telfer, Mohabir, and Saunders acted under color of state law to deprive him of the equal protection of law under the Fourteenth Amendment. The same legal standard applies to equal protection claims brought pursuant to § 1983 as intentional discrimination claims brought under Title

VII.  *See Williams v. Seniff*, 342 F.3d 774, 787-88 (7th Cir. 2003).  The only difference is that Title VII claims are brought against the employer while equal protection claims under § 1983 are brought against individual public officials.  *Salas v. Wis. Dep't of Corrections*, 493 F.3d 913, 925 (7th Cir. 2007).  Therefore, for the reasons stated above, the court finds that Ross has presented sufficient evidence to raise triable issues of fact on his § 1983 equal protection claim.

Before proceeding to Ross's other § 1983 claims, the court must consider defendants' contention that Ross has not demonstrated an adequate causal connection between the alleged constitutional violations and each individual defendant.  It does not appear that defendants challenge Mohabir's potential liability under § 1983.  Rather, defendants focus their attention on Saunders, Freer and Telfer.

With respect to Saunders, Ross claims that she acted with deliberate indifference to the discriminatory conduct of her subordinates, Telfer, Freer and Mohabir.  In general, supervisors are not vicariously liable for § 1983 violations of their subordinates unless they knew or should have known of their subordinates' misconduct and failed to act to prevent it.  *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003).  Ross claims that both he and Jones told Saunders about Mohabir's racially charged comments and the harassing behavior Mohabir exhibited in Ross's office prior to, and during the course of, the special audit.  Ross also claims that he protested that the manner in which Mohabir

-26-

conducted the audit was inconsistent with UWW audit policies. Saunders denies that she received any kind of warning from Ross or Jones that Mohabir may be acting out of discriminatory animus. Whether Saunders, Jones or Ross are to be believed is a matter for trial. For the purposes of summary judgment, Ross has established a causal link between Saunders and the alleged discrimination.

With respect to Telfer and Freer, Ross claims that they were personally involved in Saunders decision to demote him. For a government official to be held liable under § 1983, a plaintiff must establish "some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Doyle v. Camelot Care Ctrs, Inc.*, 305 F.3d 603, 614-15 (7th Cir. 2002). The court finds that Ross has met this burden for purposes of summary judgment. During all points relevant to this case, Freer held oversight authority over the internal audit department and Mohabir. Ross claims that he also told Freer about Mohabir's racially charged comments and Mohabir's conduct that Ross considered inappropriate. Freer admits that he later took ownership of the special audit report and made some undisclosed changes to it before it was finalized. When viewed in a light most favorable to Ross, this evidence could establish that Freer consented to or willfully ignored Mohabir's alleged discriminatory conduct in conducting the special audit. Similarly, Ross has presented evidence, in the form of testimony, that both he and Jones informed Telfer about Mohabir's racially charged comments and her noncompliance with UWW audit procedures and polices. Telfer also took an

-27-

active role in Saunders's deliberations on the matter of Ross's demotion, and in the later efforts to recover monies Ross allegedly owed UWW. Therefore, the court finds that Ross has presented sufficient evidence to establish a causal connection between the alleged constitutional violations and Saunders, Freer and Telfer.

### C.     § 1983 Due Process Claim

In the complaint, Ross also alleges that Saunders, Telfer, Freer, and Mohabir deprived him of due process of law in violation of the Fourteenth Amendment. Ross claims that defendants damaged his reputation by releasing false accusations in the special audit report, and thereby deprived him of the opportunity to become a college administrator. When viewing a procedural due process claim under § 1983, the court must first consider whether the plaintiff has demonstrated that the defendants deprived him of a constitutionally protected liberty or property interest. *Williams v. Seniff*, 342 F.3d 774, 786-87 (7th Cir. 2003) (citations omitted). The parties agree that Ross did not have a sufficient property interest in his position as dean under Wisconsin law to be constitutionally protected. Therefore, to prevail on his due process claim, Ross must demonstrate that defendants deprived him of a constitutionally protected liberty interest.

In general, a person does not have a constitutionally protected liberty interest in his reputation. *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (citing *Paul v. Davis*, 424 U.S. 693 (1976)). However, "state employees have a liberty interest in not being discharged from their employment while being defamed such

that they cannot get other government employment." *Id.* (quoting *Stasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998)). Therefore, a plaintiff asserting a liberty interest relating to his damaged reputation must show an "alteration of legal status, such as the governmental deprivation of a right securely held, which, combined with the injury resulting from the defamation, justifie[s] the invocation of procedural safeguards." *Brown v. City of Mich. City, Ind.*, 462 F.3d 720, 730 (internal quotation marks omitted) (quoting *Paul*, 424 U.S. at 708-09).

Here, Ross has put forth sufficient evidence to allow a reasonable jury to find he was defamed by defendants. First, the drafting and release to the media of the special audit report and subsequent reimbursement memos could have damaged Ross's reputation. The special audit report contained findings, under headings such as "inappropriate business expenditures," which suggested that Ross had misappropriated UWW resources with his procard. The released memos could also reasonably be viewed as damaging, since those documents requested that Ross actually reimburse the university for hundreds of thousands of dollars in past expenditures. Second, Ross has presented evidence that portions of the special audit report, and subsequent memoranda, falsely accused Ross of misusing university resources. The record reflects that the special audit report may have been hastily put together and released to the media, and that some of the items classified in the report as inappropriate expenditures were, in fact, perfectly legitimate. The successive reimbursement memoranda tend to show that the audits' findings were

-29-

unreliable since defendants themselves could not come to a consensus on how much Ross might owe.

That Ross may be able to prove defamation by defendants, however, is not sufficient for his procedural due process claim to survive summary judgment. Ross must also demonstrate that defendants questioned his "good name, reputation, honor or integrity" to such an extent that it would be virtually impossible for him "to find new employment in his chosen field." *McMahon v. Kindlarski*, 512 F.3d 983, 988 (7th Cir. 2008) (citation omitted). In an affidavit, Ross claims that at the time of his demotion he had a job offer for a position as an associate vice president of an unnamed university as well as some interviews for other positions. (PAPFF ¶ 250). After the special audit report was released and he was demoted, Ross claims that his job offer was rescinded and the other interviews were cancelled. (PAPFF ¶ 251). Ross also claims that he has not been able to obtain comparable employment since his demotion. While the court does not question Ross's claims that he lost a job offer and job interviews after the special audit report was made public, Ross has failed to demonstrate that the demotion, coupled with the alleged defamatory nature of defendants' audit and memoranda, has made it virtually impossible for him to find new employment as a college administrator or professor at a college or university. The loss of one job offer and an unspecified number of interviews is insufficient. Before being demoted, Ross was an administrator and a professor at UWW. He remains a professor. Defendants' actions may have caused impairment to Ross's

aspirations of being an administrator at a college or university, but such an impairment does trigger constitutional liberty interest concerns under the Due Process Clause of the Fourteenth Amendment. *Hojnacki*, 285 F.3d at 548 (noting that "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes 'serious impairment of one's future employment'"). Accordingly, the court is obliged to grant defendants' motion for summary judgment with respect to Ross's due process claim.

### D.    § 1983 First Amendment Retaliation Claim

In the complaint, Ross also alleges that Mohabir, Telfer and Freer expanded the scope of their special audit and that Saunders ultimately demoted him because Ross spoke out publicly against what he perceived as racist auditing practices at UWW. To prevail on a First Amendment retaliation claim under § 1983, a plaintiff must produce sufficient evidence for a reasonable jury to conclude that the plaintiff engaged in constitutionally protected speech, that the plaintiff suffered a deprivation likely to deter the free exercise of the plaintiff's First Amendment rights, and that the plaintiff's speech was a motivating factor in the employer's adverse action. *Valentino v. Vill. of S. Chicago Heights*, 2009 WL 2253406, at *3 (7th Cir. 2009) (citing *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). As with other employment discrimination claims, courts assessing employer retaliation claims under § 1983 look to the *McDonnell Douglas* burden-shifting framework. Therefore, at the summary judgment stage, if the plaintiff establishes a prima facie case, the burden

shifts to the defendant to show that it would have taken the employment action notwithstanding the plaintiff's protected speech. *Id.* If the defendant puts forth a legitimate reason, the plaintiff must counter with sufficient evidence to demonstrate that the defendant's reason was a mere pretext. *Id.*

Defendants do not challenge the fact that Ross engaged in constitutionally protected speech by making statements to the media during the course of the special audit. Rather, defendants argue that Ross's First Amendment retaliation claim should be dismissed against Telfer, Freer and Mohabir because they were not the decisionmakers in the alleged retaliatory action – i.e., Ross's demotion. Ross responds by arguing that all of the individual defendants were personally involved in retaliatory conduct. Ross asserts that a short time after he complained about Mohabir's audit practices both internally and to the media, Telfer, Freer and Mohabir decided to expand the scope of the special audit. In further support of Telfer's personal involvement, Ross cites his own testimony in which he stated that Telfer approached him shortly after he made comments to the media about the propriety of UWW's auditing of black deans at UWW, and warned him not to say anything else. (PAPFF ¶ 168). Finally, Ross argues that the special audit itself could constitute actionable retaliation since defendants expanded the audit substantially after he criticized Mohabir's behavior in conducting the audit. As the court noted above, § 1983 liability for employment discrimination extends to those public officials having personal involvement with the constitutional violation. *See Doyle*, 305 F.3d

-32-

at 614-15. The court finds that Ross has presented sufficient evidence to establish that Telfer, Freer and Mohabir were personally involved in the alleged retaliatory actions.

Defendants also claim that Ross has failed to establish the requisite causal connection between Ross's comments to the media and his eventual demotion. Defendants argue that Ross must show that but for his public statements, Saunders would not have demoted him. Defendants, however, appear to misapprehend the law on this point. For the Seventh Circuit has held that, in the context of a retaliation claim under § 1983, the plaintiff's speech need only be a motivating factor in the employer's adverse employment action. *See Massey*, 457 F.3d at 717 (holding that "[a] motivating factor does not amount to a but-for factor or to the only factor . . ."). Defendants claim that Saunders's decision to demote Ross came over six months after Ross first made statements to the media, and that Saunders demoted Ross on the basis of the special audit report findings.

The court finds that Ross has presented sufficient evidence to establish a prima facie case of First Amendment retaliation. Specifically, the court finds that a reasonably jury could conclude that Ross suffered through a sham audit process which led to his demotion, and that Ross's open criticism of defendants' treatment of Jones and himself was a motivating factor in Telfer, Freer and Mohabir expanding the special audit and in Saunders's decision to demote Ross. The same reasonable

jury could also find that the actions of Telfer, Freer, Mohabir and Saunders were likely to deter the free exercise of Ross's First Amendment rights.

The court also concludes that defendants have met their burden in putting forth legitimate reasons for expanding the special audit and demoting Ross. Defendants claim that they expanded the special audit because prudent auditing practices called for it, and that Saunders demoted Ross because the results of the special audit showed that Ross had failed to comply with UWW procard purchase policies. However, Ross has provided sufficient evidence for a reasonable fact finder to conclude that these reasons were a pretext for demoting him at least in part for exercising his First Amendment rights. Namely, Ross has put forth evidence, in the form of expert testimony, that defendants' auditing practices were far from prudent, and that the findings of the special audit were false and unreliable. As a result, the court is obliged to deny defendants' motion for summary judgment on Ross's First Amendment retaliation claim under § 1983.

### E. Title VII Retaliation Claim

Ross has also alleged a retaliation claim under Title VII against defendants for expanding and falsifying the special audit and demoting him because he openly complained about what he considered to be discriminatory conduct by Mohabir. Title VII proscribes employer discrimination against an employee "because he has opposed any practice made an unlawful employment practice by the statute or because he has made a charge, testified, assisted, or participated in [a relevant]

-34-

investigation, proceeding, or hearing." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (internal quotation marks omitted) (citing 42 U.S.C. § 2000e-3(a)). In a Title VII retaliation claim, the court must consider the same direct and indirect methods of proof available in Title VII discrimination claims. *Id.* Under the direct method, a plaintiff must show direct or circumstantial evidence of a statutorily protected activity, an adverse action by the employer, and a causal connection between the protected activity and the adverse action. *Id.* The indirect method of proving a Title VII retaliation claim requires the plaintiff to survive the same burden-shifting analysis as the § 1983 retaliation claim. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 731-32 (7th Cir. 2001).

In support of their motion for summary judgment, defendants make the same arguments in favor of dismissing Ross's Title VII retaliation claim as they do for Ross's First Amendment retaliation claim. Specifically, defendants assert that Ross must show but-for causation to prevail on a Title VII retaliation claim. Since the causation analysis for a Title VII retaliation claim is the same as in a § 1983 retaliation claim, the court finds that defendants' argument on this front fails as a matter of law. *See Spiegla v. Hull*, 371 F.3d 928, 943 n.10 (7th Cir. 2004). Moreover, Ross has presented sufficient evidence to establish that his complaints about Mohabir's alleged discriminatory conduct could have been a motivating factor in his subsequent demotion. Because the court finds that Ross has presented triable issues of fact for a jury for the same reasons triable issues remain on his First

Amendment retaliation claims, the court is obliged to deny defendants' motion for summary judgment with respect to Ross's Title VII retaliation claim.

### F.    § 1985 Conspiracy Claim

Ross's final claim in the complaint alleges that Telfer, Mohabir and Freer engaged in concerted action to target Ross and the other black dean at UWW, Jones, in violation of 42 U.S.C. § 1985.  Section 1985 prohibits persons from conspiring to deprive another person of his or her constitutional rights.  To establish liability under § 1985, a plaintiff must show the following four elements:

> (1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.

*Keri*, 458 F.3d at 642 (citations omitted).

Defendants argue that Ross's conspiracy claim fails because Ross has not demonstrated any constitutional violation, and because there is no evidence of any agreement between Telfer, Freer and Mohabir to discriminate against Ross.  Ross responds by directing the court back to Mohabir's statement that black deans were being targeted for special audits because the white deans were more honest than the black deans.  Ross claims that Mohabir's statement establishes that racial animus motivated  the special audit, and that a jury could infer that Telfer and Freer shared this animus since they ordered the special audit in the first place.  Ross

-36-

claims that this evidence shows that Telfer, Freer and Mohabir understood and agreed to a general objective of targeting black deans for audits.

Because Ross has failed to make a sufficient showing to establish that Mohabir conspired with Telfer and Freer, the court is obliged to dismiss Ross's § 1985 claim. Ross alleges a conspiracy took place entirely within the confines of UWW, Freer being Mohabir's direct supervisor and Telfer being Ross's direct supervisor. Therefore, Ross's conspiracy claim must be viewed as a corporate conspiracy. *See Keri*, 458 F.3d at 642 (applying intra-corporate conspiracy doctrine to a university). Under the intra-corporate conspiracy doctrine, an actionable conspiracy under § 1985 normally does not arise where two or more agents of a corporate entity participate in a decision that results in a single act of discrimination. *See Hartman v. Bd. of Trustees of Community Coll. Dist. No. 508, Cook County, Ill.*, 4 F.3d 465, 470 (7th Cir. 1993). Therefore, co-conspirators in a corporate conspiracy must be outside the corporation, or acting outside the scope of their employment. *See Keri*, 458 F.3d at 642. Corporate agents act outside the scope of their employment when their actions are shown to be motivated solely by personal bias. *Id.* Here, while Ross has presented evidence that Mohabir may have been motivated by personal bias, the record is devoid of any proof that Telfer and Freer were acting outside of the scope of their employment by ordering the special audit of Ross or by approving the expansion of the audit. As a result, Ross has failed to establish a conspiracy within the meaning of § 1985.

**2.      Plaintiff's Motion for Summary Judgment**

The court now turns to Ross's motion for summary judgment.  In his motion, Ross seeks the dismissal of the Board of Regents' breach of fiduciary duty and intentional misrepresentation counterclaims.  Ross asserts that the breach of fiduciary duty claim is time-barred, and that the Board of Regents has failed to put forth sufficient evidence to establish its intentional misrepresentation claims.

**A.      *Breach of Fiduciary Duty Claim***

The Board of Regents alleges, in its answer and counterclaims to Ross's complaint, that Ross had a fiduciary duty as dean of the college of letters and sciences to use university financial resources solely for the benefit of UWW and not for his personal benefit.  The Board of Regents further claim that Ross breached that duty by violating UWW procard policies and procedures, as well as travel expense procedures.

The parties agree that Wisconsin law governs the Board of Regents' counterclaims.  Under Wisconsin law, an action to recover damages for a breach of fiduciary duty must be commenced within two years after the cause of action accrues.  *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 925 (7th Cir. 2007) (citing Wis. Stat. § 893.57).  A breach of fiduciary duty claim accrues "when the injury is discovered or with reasonable diligence should be discovered, whichever occurs first."  *Lewis v. Paul Revere Life Ins.*, 80 F.Supp.2d 978, 1004 (E.D. Wis. 2000) (citing *Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578 (Wis. 1983)).  Put

-38-

another way, the statute of limitations tolls "until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person." *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 21 (quoting *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 780 (Wis. 1995)). When the underlying facts are not in dispute, whether a plaintiff has exercised reasonable diligence to discover a cause of action is a question of law. *Id.* at ¶ 13.

In support of his motion, Ross asserts that the two-year limitations period began to run when the Board of Regents knew or reasonably should have known that Ross had not followed UWW procard policies and procedures. This, Ross argues, occurred well before April 9, 2006, two years prior to the date on which the Board of Regents filed its counterclaims. Ross notes that the 1999, 2000, 2003, and 2004 procard audits found that Ross had not complied with UWW procard procedures, and that Telfer and Freer were aware of these findings when they ordered the special audit of Ross's procard usage in December of 2004 or January of 2005. Finally, Ross claims that Mohabir had completed the special audit report by March of 2006, even though the final report was not completed until April 19, 2006.

The Board of Regents responds arguing that the audits only revealed to the Board of Regents that Ross was not suitable for the administrative position he held, but they did not establish that Ross had actually misappropriated UWW resources.

The Board of Regents asserts that it was not able to determine whether Ross had misappropriated anything until it conducted a post-audit investigation after the final special audit report came out. The Board of Regents further asserts that it "was reticent about accusing Ross of misappropriating the Board's resources" without first conducting a post-audit investigation.

The parties do not dispute that a fiduciary duty arose between Ross and the Board of Regents by virtue of his position as dean of UWW's college of letters and sciences.[8] Therefore, the question for the court is when the Board of Regents discovered or, with reasonable diligence, should have discovered that it had suffered losses and that those losses were attributable to Ross's alleged misuse of his procard. To the extent the Board of Regents suffered actual losses due to Ross's alleged misuse of his procard, the court finds that the Board of Regents knew or should have known of this injury and its cause on or about December 21, 2004, the date on which Hirschfield, UWW's procard administrator, sent a memorandum to Randy Marnocha, then an associate vice chancellor, recommending "removal" of Ross's procard for "non-compliance purchasing." Hirschfield's 2004 review found that Ross had not complied with UWW procard policies in purchasing alcohol, upgraded hotel rooms, flowers, and On-Star service. Shortly thereafter, Freer and Telfer ordered a special audit of Ross's procard activities for the first six months of

---

[8]To prove a breach of fiduciary duty claim, a plaintiff must show that a fiduciary duty existed between the plaintiff and defendant, that the defendant breached that duty, and that the breach caused the plaintiff injury. *Marshfield Mach. Corp v. Martin*, 2001 WI App 146, ¶ 8 (citations omitted). Wisconsin courts have recognized that a fiduciary duty of good faith and loyalty may arise between an employer and a key employee. *Id.*

-40-

2005.  The Board of Regents concedes that this special audit was meant to take a closer look at Ross's expenditures and determine whether Ross had modified what it considered to be his improper procard purchasing habits of the past.

The court recognizes that the Board of Regents, through its constituent administrators at UWW, had to decide in late 2004 what to do about allegations of Ross's improper procard usage.  Telfer and Freer decided to conduct a special audit.  The prudence of that decision is irrelevant.  If the Board of Regents' allegations are to be believed, Telfer, Freer and others at UWW were well-aware that Ross was using his procard in a manner that was inconsistent with UWW policies and procedures.  In fact, nearly all of Ross's procard purchases that the Board of Regents now cite as evidence of Ross's breach of fiduciary duty had been identified by the university during the 2000, 2003 and 2004 audits.  Defendants' reticence in acting on their discovery did not toll the limitations period.  Even when viewing the facts in the light most favorable to the Board of Regents, the court is unable to conclude that the Board of Regents' potential breach of fiduciary duty claim accrued on or after April 9, 2006.  Therefore, the court is obliged to dismiss the Board of Regents' counterclaim for breach of fiduciary duty as time-barred.

**B.    *Intentional Misrepresentation Claim***

In its answer and counterclaims, the Board of Regents also alleges that Ross intentionally misrepresented the nature of his procard purchases by submitting false,

misleading and incomplete information to the Board of Regents and its agents, and that the Board of Regents relied on Ross's misrepresentations to its detriment.

To prove a claim of intentional misrepresentation, a plaintiff must show the following five elements: (1) that the defendant made a representation of fact; (2) that the representation was untrue; (3) that the defendant made the representation either knowing it was untrue or recklessly not caring whether it was true; (4) that the defendant made the representation with intent to deceive the plaintiff in order to induce the plaintiff to act on it to plaintiff's pecuniary damage; and (5) that the plaintiff believed that the representation was true and relied on it. *Kaloti Enters., Inc. v. Kollogg Sales Co.*, 2005 WI 111, ¶ 12. Each of these elements must be established by "clear, satisfactory, and convincing evidence." See *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 52 (Wis. 2003) (noting that Wisconsin's middle burden of proof applies to intentional misrepresentation claims); Wis. JI-Civil 205 (2005) (defining Wisconsin's "middle burden").

In his motion for summary judgment, Ross asserts that the Board of Regents has failed to prove he made any intentional misrepresentations. Ross argues that the Board of Regents has established, at most, that he did not consistently follow some of UWW's record keeping policies for procard purchases. Ross notes that the special audit report did not find that he had made any misrepresentations of fact, or that he misstated any of his procard purchases. Ross also cites to a portion of Freer's deposition testimony in which Freer confirmed that the audits of Ross's

procard purchases did not indicate any fraud. In his deposition, Freer also expressed his belief that all of Ross's procard expenditures were made for the benefit of UWW. Ross further suggests that the intentional misrepresentation claim alleged against him by the Board of Regents is nearly identical to a claim lodged against Jones in a separate lawsuit, indicating that the Board of Regents may not have brought this claim in good faith.

In response, the Board of Regents argues that the evidence establishes that Ross repeatedly made two types of misrepresentations. First, the Board of Regents asserts that each time Ross made a purchase with his procard, he was implicitly representing to the Board of Regents that the purchase was for a proper university purpose. Since some of his purchases were not for a proper university purpose, the Board of Regents claims that some of Ross's representations must have been untrue. In support of this contention, the Board cites several examples of procard purchases that it claims one could reasonably infer were for personal, rather than university, purposes, including expenditures on Netflix, Yahoo Personal Services, AOL, T-Mobile, OnStar, hotel stays while taking French lessons, internet-based music services, and department store items. The second type of misrepresentation the Board of Regents asserts that Ross repeatedly made, related to Ross's promise to comply with certain record keeping requirements as a procard holder. The Board of Regents posit that each time Ross made a procard purchase, he implicitly represented that he was keeping proper records of his purchase. Since Ross was

-43-

found by the various audits not to have fully complied with UWW's record keeping policies, the Board of Regents claims that Ross's implied representation should also be considered untrue.

Viewing the evidence presented in a light most favorable to the Board of Regents, the court finds that the Board of Regents has failed to establish a claim of intentional misrepresentation. In general, an actionable misrepresentation must be based on existing or past facts, and "cannot be based on future events or facts not in existence when the representation was made, or on unfulfilled promises." *Schurmann v. Neau*, 2001 WI App 4, ¶ 10 (citing *Hartwig v. Bitter*, 139 N.W.2d 644, 647 (Wis. 1966)); *see also* Richard A. Lord, 26 Williston on Contracts § 69:11 (4th ed.). The only exception to this rule is when the promisor has the present intent not to perform a promise when the promise is made. *See Constr. Mortgage Investors Co. v. VWH Dev., LLC*, 2009 WI App 56, ¶ 5 (citation omitted).

To the extent that Ross made any actionable implicit representations that his procard purchases were for the university purposes only, the Board of Regents has failed to demonstrate that any of those implied representations were untrue. The Board of Regents urges the court to take the limited description of payees such as On-Star and Yahoo Personal Services, and infer that those purchases were for his personal benefit rather than for the benefit of UWW. From this scant evidence, neither the court, nor a reasonable jury, could infer that any of Ross's purchases were not made solely for the benefit of UWW.

-44-

With respect to Ross's compliance with procard policies, the Board of Regents has not established that Ross made any misrepresentations. Ross may have promised to follow UWW procard record keeping policies at one time, but the Board of Regents has not demonstrated that Ross had the present intent not to perform his promise when the promise was made. Without such proof, any breach of Ross's past promise to conform with UWW policies is not now actionable as an intentional misrepresentation. Therefore, the Board of Regents has failed to prove that Ross made any representations of fact with respect to keeping adequate records of his procard purchases.

The Board of Regents also points to an instance in which Ross was reimbursed twice for the same procard travel purchases as proof supportive of its misrepresentation claim. It claims that Ross charged travel expenses on his procard, and then sought reimbursement from a third party for the same expenses. Yet, in its briefing to the court, the Board of Regents has not identified any facts that Ross supposedly misrepresented to it with respect to this alleged "double-dipping" for travel expenses. Nor has the Board of Regents established if or when Ross ever solicited reimbursement from the third party or whether Ross was aware or should have been aware that he had been reimbursed for an expense which had already been paid for by UWW. Moreover, it appears that Ross paid UWW back the amount for which he was reimbursed.

Notwithstanding the lack of evidence establishing that Ross made any untrue representations of fact, the Board of Regents has also failed to put forth any evidence of Ross's deceptive intent or the Board of Regents' reliance. At most, the evidence establishes that Ross was careless in his procard record keeping. It does not establish either intentional or reckless conduct aimed at deceiving the Board of Regents. Therefore, the court is obliged to grant Ross's motion for summary judgment and dismiss the Board of Regents' counterclaim for intentional misrepresentation.

### 3. Ross's Motions to Strike

The court now turns to Ross's two motions to strike portions of certain affidavits defendants have submitted in support of their motion for summary judgment.

In considering motions for summary judgment, the court must confine itself to the evidence submitted by the parties that would be admissible at trial. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). The evidence must be admissible in content, but not necessarily in form. *Id.* Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, affidavits submitted in support or in opposition to a motion for summary judgment must be based on personal knowledge. However, the court need not aggressively parse affidavits where the content to be stricken is insufficient to support a genuine issue of material fact. *See*

-46-

*O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) (citation omitted).

In his first motion to strike, Ross claims that portions of affidavits submitted by Freer, Klink, Mohabir, Pinkerton, Jane Radue, Saunders, and Telfer contain conclusory and self-serving statements without adequate supporting evidence, contain legal argument, and are mere conjecture made without personal knowledge. After reviewing the portions of those affidavits to which Ross takes exception, it is apparent to the court that many of the affidavits contain statements that are conclusory and speculative. Yet, the court finds no need to strike those portions, and overrules Ross's objections. As defendants aptly note in their response to Ross's motion, many of the underlying facts conveyed in the challenged affidavits are not even in dispute. Other portions challenged by Ross are largely irrelevant or immaterial to the parties' motions for summary judgment. To the extent that the portions of the affidavits to which Ross objects were not based upon the affiant's personal knowledge, and the underlying factual content of those averments was both material and disputed, the court has not considered those portions in deciding the parties' motions for summary judgment. Accordingly, the court will deny Ross's first motion to strike.

In his second motion to strike, Ross requests that the court strike from the record all documents obtained by defendants through a subpoena served on the Higher Learning Commission, the third party that allegedly reimbursed Ross for

-47-

travel expenses Ross had already charged to his procard. Ross claims that defendants did not comply with Rule 45 of the Federal Rules of Civil Procedure when issuing the subpoena, because they did not provide Ross with notice and because the subpoena was issued by the wrong court. Ross also claims that portions of the affidavit of Randy Marnocha relating to the Higher Learning Commission should be stricken as speculative.

In response, defendants' counsel concedes that he failed to notify Ross of the subpoena served on the Higher Learning Commission, and that he did not comply with Rule 45. Defendants agree that the documents produced by the Higher Learning Commission pursuant to that improperly issued subpoena should be stricken for purposes of summary judgment. With respect to Marnocha's affidavit, defendants assert that it complies with Rule 56(e).

In reply, Ross argues that defendants should be barred altogether from using any of the documents produced pursuant to the improperly issued subpoena. With respect to the Marnocha affidavit, Ross reiterates that the affidavit conflicts with Marnocha's deposition testimony on the issue of the Higher Learning Commission.

With respect to the improperly issued subpoena, the court will order that Exhibit D to the supplemental affidavit submitted by Nadim Sahar at Docket #71 be stricken from the record. However, the court declines to prospectively bar the future use of any documents obtained pursuant to the tainted Higher Learning Commission subpoena. In light of the court's rulings today, Ross's dealings with the Higher

Learning Commission may have limited relevance to the remaining claims. However, should either party offer any documents to the court obtained pursuant to the aforementioned subpoena, the court would entertain a renewed objection at that time.

With respect to the Marnocha affidavit, the court found that the Board of Regents had failed to raise a genuine issue of material fact with respect to Ross's receipt of a reimbursement of travel expenses from the Higher Learning Commission. The information conveyed by Marnocha in his affidavit, even if it had conformed with Rule 56(e), would not have altered the court's rulings on the parties' motions for summary judgment. Therefore, the court finds no reason to strike Marnocha's affidavit.

Finally, the court notes that defendants filed a motion for a two-day extension of time to file their brief in opposition to Ross's motion for summary judgment. The motion is unopposed and the court will grant it.

Accordingly,

**IT IS ORDERED** that plaintiff's motion for summary judgment (Docket #31) be and the same is hereby **GRANTED**; the counterclaims asserted by the Board of Regents of the University of Wisconsin System against the plaintiff are hereby **DISMISSED** with prejudice;

-49-

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Docket #37) be and the same is hereby **GRANTED** in part and **DENIED** in part; plaintiff's due process claim brought pursuant to 42 U.S.C. § 1983 and plaintiff's conspiracy claim brought pursuant to 42 U.S.C. § 1985 are hereby **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that defendants' motion for extension of time (Docket #51) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion to strike (Docket #65) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that plaintiff's second motion to strike (Docket #89) be and the same is hereby **GRANTED** in part and **DENIED** in part; Exhibit D to the Supplemental Affidavit of Nadim Sahar (Docket #71) is hereby **STRICKEN** from the record.

Dated at Milwaukee, Wisconsin, this 3rd day of September, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-50-